J-S21043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                      :  PENNSYLVANIA
                                      :

            v.                       :

NATHAN TOWNSEND              :

           Appellant        :  No. 197 EDA 2023

Appeal from the Judgment of Sentence Entered December 19, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003591-2018

BEFORE:  LAZARUS, P.J., NICHOLS, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:         **FILED SEPTEMBER 5, 2024**

Nathan Townsend (Appellant) appeals from the judgment of sentence imposed after a jury convicted him of one count each of rape of a child, corruption of minors, indecent assault of a person less than 13 years of age, and unlawful contact with a minor.[1]  After careful review, we affirm.

On January 7, 2018, the Commonwealth filed a criminal complaint charging Appellant with, *inter alia*, the above offenses.  The charges stemmed from allegations that Appellant anally penetrated a minor victim (A.A.) on numerous occasions over several years.  On September 19, 2022,[2] Appellant

_____

[1] 18 Pa.C.S.A. §§ 3121(c), 6301(a)(1)(ii), 3126(a)(7), 6318(a)(1).

[2] On September 8, 2022, Appellant filed a motion to dismiss alleging violations of his state and federal constitutional speedy trial rights and Pa.R.Crim.P. 600. On September 16, 2022, following a hearing, the trial court denied Appellant's motion.

proceeded to a jury trial. The trial court summarized the testimony adduced

at trial:

> The testimony established that when [A.A.] was six years old, she was living with her mother, Hawwah Aziz[, (Ms. Aziz)]. N.T., 9/20/22, at 48. When A.A. was between the ages of six and eight years old, [Ms. Aziz] was working as a chef outside of Philadelphia, which required her to leave for work very early. *Id.* at 65, 139-140. Accordingly, Ms. Aziz made arrangements for her brother, Robert Hanson (A.A.'s uncle[, Mr. Hanson]), to watch A.A. in the morning, and take her to school, which was near his home. Mr. Hanson lived with his girlfriend, Betty Jackson[ (Ms. Jackson)], and her [adult] son, Appellant []. … Ms. Aziz would wake A.A. early in the morning, between 4:00 and 5:00 [a.m]., and take her to Mr. Hanson's house, where he would make up a place for her to sleep in the living room, and A.A. would go back to sleep for a few hours before getting up to go to school. *Id.* at 48-50, 139.
>
> In the morning, while A.A. was sleeping at [Mr. Hanson's] house, Appellant would climb into bed with A.A. and penetrate her anus with his penis. *Id.* at 52-54. This went on nearly every school day for approximately two [to] three years, continuing when Mr. Hanson, [Ms. Jackson,] and Appellant moved to another home. *Id.* at 55, 56, 72, 81. A.A. did not tell anyone what was happening, because she was afraid of her parents getting upset and of getting in trouble. *Id.* at 54.
>
> However, when A.A. was eight years old, she went on vacation to the Jersey Shore with her aunt and her aunt's family. *Id.* at 59, 96. One of A.A.'s cousins told their mutual grandmother, Brenda Hanson[ (Grandmother)], that A.A. was crying the whole vacation, but would not say why. *Id.* at 96. [Grandmother] took [A.A.] aside and asked her questions in an attempt to ascertain why she was upset. *Id.* at 58, 97-98. A.A. said that she did not want to go back to [Mr. Hanson's] house, and said they were mean to her. *Id.* at 98. U[pon] further questioning, A.A. eventually told her grandmother that Appellant had anally penetrated her multiple times. *Id.* at 99-101, 111. [Grandmother] then called Ms. Aziz to come to her house. Upon learning what had happened, Ms. Aziz called the police. *Id.* at 60, 103, 154.

Officer [Marcus] Baker responded to [Grandmother]'s house, where he spoke to A.A., who told him that Appellant had been touching her private parts with his private parts. *Id.* at 158, 162, 164-65, 170. A.A., [Ms. Aziz, and Grandmother] were then taken to the Special Victims Unit, where Detective Jonathan Ruth referred A.A. to the Philadelphia Children's Alliance to be interviewed. *Id.* at 104-05, 177-78; N.T., 9/21/22, at 31-32. That interview was video recorded. *See* Exhibit C-2. A.A. was then taken to Children's Hospital of Pennsylvania [(CHOP),] where she was examined and found to be "normal," meaning [the examination revealed] no signs of intercourse. N.T., 9/20/22, at 61-62; N.T., 9/21/22, at 59-60. [Dr. Philip Scribano (Dr. Scribano) testified at trial] that such a normal presentation was not inconsistent with repeated anal penetration of a child by an adult male. N.T., 9/21/22, 60-63, 67.

Trial Court Opinion, 7/6/23, at 2-3 (some citations modified).

On September 22, 2022, the jury convicted Appellant of the above offenses. On December 19, 2022, the trial court sentenced Appellant to an aggregate 5 to 14 years in prison, followed by three years' probation. The trial court further imposed lifetime sex offender registration pursuant to the Pennsylvania Sex Offender Registration and Notification Act,[3] which generated litigation irrelevant to the instant appeal. Appellant timely appealed. Both the trial court and Appellant have complied with Pa.R.A.P. 1925.

On September 28, 2023, Appellant filed a petition for remand with this Court. Therein, Appellant asserted the trial court

denied [A]ppellant's Motion to Dismiss based on Rule 600([A]), finding the Commonwealth was duly diligent in bringing [A]ppellant to trial. When the Motion turned to the state and federal constitutional grounds, and specifically the factors enunciated in *Barker v. Wingo*, 407 U.S. 514 (1972), the trial

---

[3] *See* 42 Pa.C.S.A. §§ 9799.14 - 9799.15.

court conflated the Rule 600 grounds with the due process provisions of the state and federal constitutions, and refused to hear evidence regarding the prejudice prong of **Barker v. Wingo**. The trial court denied this constitutional claim, failing to recognize it as a separate and distinct basis of the Motion.

Petition for Remand, 9/28/23, at 1 (unpaginated). Appellant argued that, because the trial court acknowledged this error in its Rule 1925 opinion (discussed further below), his case should be remanded to afford him the opportunity "to present evidence or call witnesses on the issue." **Id.** at 2 (unpaginated). We denied Appellant's request without prejudice to his ability to raise the issue in his appellate brief. **See** Order, 11/9/23, at 1.

Appellant presents the following issues:

A. Did the [trial] court err and abuse its discretion when it denied [Appellant's] motion to dismiss pursuant to [Pa.R.Crim.P.] 600(A)[,] where well more than 365 days had passed subsequent to the adjusted run date, and the Commonwealth failed to exercise due diligence in bringing the case to trial?

B. Did the [trial] court err and abuse its discretion when it denied [A]ppellant's motion to dismiss[,] based on properly raised constitutional speedy trial grounds[,] when it erroneously conflated Rule 600 with the constitutional speedy trial claims, and denied the defense an opportunity to call it[]s proffered witness to establish prejudice[,] as required under **Barker v. Wingo**?

C. Did the trial court deprive [] Appellant of his right to a fair and impartial jury by refusing to ask prospective jurors on *voir dire* whether they believed a child could lie about being sexually abused, which prevented Appellant from potentially uncovering prejudicial biases or fixed opinions that would have disqualified jurors from serving?

Appellant's Brief at 3.

Appellant's first issue challenges the trial court's denial of his motion to dismiss pursuant to Pa.R.Crim.P. 600. *Id.* Specifically, Appellant challenges the trial court's exclusion from its Rule 600 calculation two periods of delay: 1) the 98-day period between the first trial listing (December 10, 2019) and the Covid-19-related suspension of Rule 600 (March 17, 2020) (the 98-day delay);[4] and 2) the 353-day period between the end of the suspension of Rule 600 (October 1, 2021) and trial (September 19, 2022) (the 353-day delay). *See* Appellant's Brief at 11.

"In general, a trial court's denial of a Rule 600 motion is reviewed for an abuse of discretion; however, it is subject to plenary review when the dispositive question implicates legal issues." *Commonwealth v. Lear*, 290 A.3d 709, 718 (Pa. Super. 2023) (citing *Commonwealth v. Harth*, 252 A.3d 600, 614 n.13 (Pa. 2021)). "The proper scope of review ... is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party." *Commonwealth v. Brown*, 281 A.3d 320, 325 (Pa. Super. 2022) (citation omitted).

---

[4] Appellant concedes the local administrative orders suspending court functions due to the Covid-19 pandemic suspended Rule 600. *See* Appellant's Brief at 11, 39; *see also Commonwealth v. Malone*, 294 A.3d 1247, 1249 (Pa. Super. 2023) ("If an order unambiguously suspends Rule 600 without qualification, then the period of the suspension is added to the run date without considering the Commonwealth's diligence." (quoting *Commonwealth v. Lear*, 290 A.3d 709, 719 (Pa. Super. 2023)).

- 5 -

"Rule 600 has the dual purpose of both protecting a defendant's constitutional speedy trial rights and protecting society's right to effective prosecution of criminal cases." ***Commonwealth v. Womack***, 315 A.3d 1229, 1237 (Pa. 2024) (quoting ***Commonwealth v. Bradford***, 46 A.3d 693, 700 (Pa. 2012)). Rule 600 provides, in part:

**(A) Commencement of Trial; Time for Trial**

(1) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere*.

(2) Trial shall commence within the following time periods.

(a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

\* \* \*

**(C) Computation of Time**

(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

\* \* \*

(3)(a) When a judge or issuing authority grants or denies a continuance:

\* \* \*

(ii) the judge shall record the identity of the party requesting the continuance and the reasons for granting or denying the continuance. The judge shall record to which party the period of delay caused by the continuance shall be

attributed, and whether the time will be included in or excluded from the computation of the time within which trial must commence in accordance with this rule.

* * *

**(D) Remedies**

(1) When a defendant has not been brought to trial within the time periods set forth in paragraph (A) at any time before trial, the defendant's attorney, or the defendant if unrepresented, may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated….

Pa.R.Crim.P. 600.

When conducting a Rule 600 analysis, we have explained:

Generally, Rule 600 requires that a defendant be brought to trial within 365 days of the filing of the criminal complaint. Pa.R.Crim.P. 600(A)(2)(a). However, a defendant is not automatically entitled to discharge under Rule 600 where trial starts more than 365 days after the filing of the complaint. ***Commonwealth v. Goldman***, 70 A.3d 874, 879 (Pa. Super. 2013).

***Commonwealth v. Martz***, 232 A.3d 801, 810 (Pa. Super. 2020) (some citations omitted).

"[P]eriods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence" forms the basis of what is known as "includable time." ***See*** Pa.R.Crim.P. 600(C)(1). Conversely, all other periods of delay are excluded from the Rule 600 calculation. ***See id.***

***Commonwealth v. Wiggins***, 248 A.3d 1285, 1289 (Pa. Super. 2021)

"Due diligence is a fact-specific concept that must be determined on a case-by-case basis. Due diligence does not require perfect vigilance and punctilious care, but rather a showing by the Commonwealth that a reasonable effort has been put forth." ***Commonwealth v. Armstrong***, 74 A.3d 228, 236 (Pa. Super.

- 7 -

2013) (citation omitted).  Due diligence includes, *inter alia*, listing a case for trial prior to the run date, preparedness for trial within the run date, and keeping adequate records to ensure compliance with Rule 600.  ***Commonwealth v. Ramos***, 936 A.2d 1097, 1102 (Pa. Super. 2007).

***Martz***, 232 A.3d at 810-11 (some citations omitted).  "[D]ue diligence must be proven by the Commonwealth, and assessed by the court, before 'judicial delay' becomes a consideration in the time calculation for Rule 600."  ***Harth***, 252 A.3d at 614 (citation omitted).

We have further observed:

It would certainly not serve the dual purpose of Rule 600 if a defendant could demand a jury trial … during a time when it is impossible for the Commonwealth to conduct a jury trial, and determine that the resulting delay was not excusable under the Rule.

***Commonwealth v. Faison***, 297 A.3d 810, 824 (Pa. Super. 2023); ***see also*** ***Commonwealth v. Marnoch***, ___ A.3d ___, 2024 WL 2716427, *7-8 (Pa. Super. filed May 28, 2024) ("[W]here a trial-ready prosecutor must wait several months due to a court calendar, the time should be treated as 'delay' for which the Commonwealth is not accountable." (citation omitted)).

The Commonwealth filed its criminal complaint against Appellant on January 7, 2018.  Criminal Complaint, 1/7/18.  Thus, under Rule 600, the mechanical run date for Appellant's trial was Monday, January 7, 2019.  At the time of Appellant's September 19, 2022, trial, 1,717 days had elapsed since the institution of charges – 1,352 days beyond the mechanical run date.

At the September 16, 2022, Rule 600 hearing, the parties agreed the following time periods were excludable for Rule 600 purposes:

- April 16, 2018, to May 10, 2018 (24 days), *see* N.T., 9/16/22, at 9.

- December 18, 2018, to December 10, 2019 (364 days), *see id.* at 12-13.

- March 17, 2020, to October 1, 2021 (563 days), *see id.* at 8.

Thus, the parties agreed that 951 days were excludable.

Moreover, the trial court ruled two additional periods of court delay were excludable: first, the 98-day delay due to the trial court's unavailability; and second, the 353-day delay attributable to the court's congested calendar in the aftermath of the Covid-19 pandemic. *Id.* at 21, 24, 28-31; *see also* Trial Court Opinion, 7/6/23, at 7. Adding these periods of court delay to the agreed-upon 951-day calculation results in 1,402 days of excludable time, adjusting the Rule 600 run date to approximately two months **after** Appellant's September 19, 2022, trial.

Concerning the 98-day delay, Appellant argues that the "Commonwealth did not deal in good faith with [Appellant] in turning over its expert's report, and the [98-day delay] should be attributable to the Commonwealth." Appellant's Brief at 25. Appellant explains his position as follows:

> In the summer of 2019, the defense began emailing the [the assigned assistant district attorney (ADA)], requesting an expert report for its proffered expert, Dr. Scribano. The Commonwealth ignored this email for a month, and the defense was forced to send a follow[-]up email. The Commonwealth responded that [it] was on its "to[-]do" list. Instead of taking action upon receipt of

- 9 -

the request, and making it number 1 on its "to-do" list, as the case was already nearly 2 years old at that point, the discovery request presumably dropped to a lower priority as it certainly was not acted upon.

Nearly a month later, the defense emailed [the ADA] again on November 12, 2019, asking for an update on the expert report. [The ADA] responded the same day, and informed [the defense] that her expert had moved, and that she was searching for a new doctor to testify.

….

Then, nearly a month later[,] on December 2, 2019, a week before trial, [the ADA] corrected herself, that she had the experts confused, and that Dr. Scribano had not moved. She told [the defense] that [Dr. Scribano's] CV and letter providing notice of his testimony had already been [supplied in discovery]. She did not address anything about the expert report.

*Id.* at 26-27. Appellant contends that the Commonwealth was not diligent in providing the requested discovery, and, as a result, the court's delay should be attributable to the Commonwealth. *Id.* at 26.

In support of his position, Appellant relies on ***Commonwealth v. Dunn***, 300 A.3d 324 (Pa. 2023) (plurality),[5] for the proposition that Pa.R.Crim.P. 573 (detailing discovery obligations) "applies with equal force to expert reports

_____

[5] Appellant does not address ***Dunn***'s precedential value. Generally, "plurality decision[s] of [the Pennsylvania Supreme] Court d[o] not constitute binding precedent[.]" ***Commonwealth v. Baldwin***, 985 A.2d 830, 835 (Pa. 2009) (citation omitted). ***Dunn*** is a *per curiam* decision, further calling into doubt its precedential value. ***See Dunn***, 300 A.3d at 324; ***see also Commonwealth v. Thompson***, 985 A.2d 928, 937 (Pa. 2009) ("[T]he legal significance of *per curiam* decisions is limited to setting out the law of the case.")). Regardless, we need not decide the precedential effect of ***Dunn***, as even if it is binding precedent, it affords Appellant no relief.

- 10 -

based on the subject matter in [42 Pa.C.S.A. §] 5920[ (providing for the use of experts in certain cases to opine as to victim responses and behaviors)]." Appellant's Brief at 28 (quoting **Dunn**, 300 A.3d at 340 (Justice Mundy, in support of affirmance)).

The Commonwealth responds that it provided all discovery "and was trial-ready before both contested periods of trial delay, which were caused solely by the trial court's own scheduling conflicts and procedures." Commonwealth Brief at 13. The Commonwealth argues that Appellant "ignores the fact that he only filed a formal request for the [expert] report five days before [the initial December 10, 2019,] trial date," and the Commonwealth "paid for, created, and disclosed the requested report within merely four days of his request." **Id.** at 14. The Commonwealth further points out that it provided notice of its intention to utilize expert testimony "far in advance of [] trial[.]" **Id.** at 14; **see also** Motion to Dismiss, 9/8/22, at 4 (Appellant acknowledging he was aware the Commonwealth intended to call an expert witness since at least July 30, 2019).

The trial court addressed Appellant's claim concerning the 98-day delay in its Rule 1925 opinion:

> The docket indicates that the case was continued to June 16, 2020, because the court was [in trial on another case]. N.T., 9/16/22, at 14. The Covid[-19] emergency order went into effect on March 17, 2020. Appellant argued that the 98 days between the December 10, 2019, continuance and the March 17, 2020, lockdown should be charged to the Commonwealth, because it had not produced an expert report, and thus would not have been ready for trial. **Id.** at 66.

However, **the Commonwealth was not required to produce an expert report. If Appellant wanted an expert report, he could have asked the court to compel one pursuant to Pa.R.C[rim].P. 573(B)(2)(b)**.[6] He did not do so until December 5, 2019, five (5) days before the case was scheduled for trial. N.T., 9/16/22, at 18. Yet, the mere filing of the motion did not create an obligation on the Commonwealth. Requiring the creation of an expert report is left to the discretion of the court. Pa.R.C[rim].P. 573(B)(2)(b). **Only if and until a court orders a report is there a duty on the part of the Commonwealth to produce one. Here, the record does not indicate that** [**an expert report was court-ordered**]. N.T., 9/16/22, at 60. But even if [the court] did so on December 10, 2019, this would not implicate any lack of diligence on the Commonwealth's part. Appellant sat on his rights until the eve of trial.

The record is clear that **the Commonwealth was prepared to proceed with its expert, without a report, and that it was Appellant's counsel who wanted a report, even though no timely motion had been filed and no report had been ordered**:

THE COURT: So communications can be seen both ways. I'm reading parts of [the email correspondence dated] December 3, 2019, at 4:40 p.m. from [the assigned ADA]: ["]I can't really answer that without knowing if [the court] will order a report to be produced and how quickly I can get one done, but I don't see why we can't proceed to trial next week.["]

….

It seems that all those communications … beginning [in] July … led to communications in early December that the Commonwealth was ready to

_____

[6] Rule 573(B)(2)(b) provides, "[i]f an expert whom the attorney for the Commonwealth intends to call in any proceeding has not prepared a report …, the court, **upon motion**, may order that the expert prepare… a report …." Pa.R.Crim.P. 573(B)(2)(b) (emphasis added).

> proceed without a report. Then the motion to compel was filed.
>
> Under these circumstances, the court concluded that the continuance by [the court] due to [it] being on trial, was not vitiated by Commonwealth unavailability due to lack of an expert report, or otherwise. To the contrary, the Commonwealth was ready to proceed to trial on December 10, 2021. The Commonwealth was duly diligent[,] and the delay was caused by the court. *See Harth*, 252 A.3d at 618.

Trial Court Opinion, 7/6/23, at 6-7 (citations modified; footnote and emphasis added).

The trial court's findings are supported by the record, and its legal conclusion is sound. Appellant failed (until the eve of trial) to avail himself of Rule 573(B)(2)(b)'s procedure for compelling the creation of an expert report. Thus, the trial court correctly concluded the Commonwealth was under no obligation to generate a report, and its refusal to do so did not impute a lack of due diligence on the part of the Commonwealth. Further, Appellant has not directed this Court to any applicable authority recasting his own failure to timely litigate this issue as Commonwealth negligence. Accordingly, the trial court did not err in excluding the 98-day delay from the Rule 600 calculation.

> Concerning the 353-day delay, Appellant contends:
>
> Once the Covid-19 Order was lifted and the clock began to tick again,… the Commonwealth [did not] ask for the earliest possible date or try to have the case relisted earlier than the nearly year[-]out date it received of September 19, 2022. The record is devoid of any evidence that the Commonwealth acted with any diligence in securing a timely trial date for [Appellant].

Appellant's Brief at 31.

- 13 -

In support of his argument, Appellant primarily relies on *Commonwealth v. Hawk*, 597 A.2d 1141 (Pa. 1991), wherein the Pennsylvania Supreme Court stated:

> [T]he Commonwealth should be held to the requirement that it exercise due diligence at all times during the pendency of a case. Although the Commonwealth had no actual control over when cases were listed in the courtroom due to the Individual Judge Calendar system, the Commonwealth failed to take any affirmative action to get the case moving by listing it for trial when the trial judge was ill and then on vacation ….

Appellant's Brief at 33 (quoting *Hawk*, 597 A.2d at 1145).

> The Commonwealth responds,

> The docket clearly mentions the COVID-19 pandemic and the bail protocols established in response. *See Docket*, Entries 133-34. It also repeatedly indicates that the Commonwealth was ready to proceed to trial[.] *See Docket*, Entries 136-42 (mentioning that there were no motions to be litigated and discovery was complete). Further, at the Rule 600 hearing, the [trial] court took judicial notice of the situation plaguing the courts at the time [A]ppellant's trial was scheduled.

Commonwealth Brief at 19.

Although a substantial period of time elapsed between the filing of Appellant's criminal complaint and trial, in its Rule 1925 opinion, the trial court explained that

> the bulk of the delay was due to Covid[-19] restrictions, which essentially shut down the [c]ourt, followed by attempts by the [c]ourt to ramp back up and try the cases which had been put on hold, prioritizing trial for defendants in custody, over those, like Appellant, who were not.[7]

---

[7] On October 11, 2018, the trial court converted Appellant's secured bail to nominal bail with the condition of house arrest. *See* Order, 10/11/18.

Trial Court Opinion, 7/6/23, at 5 (footnote added).  The record supports the

trial court's findings.

At the September 16, 2022, Rule 600 hearing, the trial court explained

as follows concerning the court's congested calendar in the aftermath of the

Covid-19 pandemic:

> [T]he situation was, as counsel says and as we all experienced, that the [trial] dates [] given were really, really long by necessity because of our limited capacity to move cases at the time[,] and the new protocols and everything that comes with it.  Clearly, the Commonwealth was not in charge of that.

N.T., 9/16/22, at 28.  Discussing the Custody Accelerated Resolution Program

(CARP), instituted by Philadelphia courts in response to the pandemic, the trial

court continued:

> A salient part of [CARP] is that bail defendants didn't get priority in the scheduling of trial dates.  So it's not like in the old days where you could explore choices with the [c]ourt's calendar or maybe sending [a case] to a different courtroom for trial to get the matter to trial earlier.
>
> That's not what we all experienced.  Just like it was out of [Appellant's] control, it was out of the Commonwealth's control. It was the [c]ourt doing that.  ….

*Id.* at 31.

The record supports the trial court's findings, and its legal conclusion is

sound.  Appellant acknowledges that the docket reflects "the earliest possible

date for trial was May 28, 2019, and the case was given a trial date of June

14, 2019."  Appellant's Brief at 21 n.2.  Even if that date was administratively

selected, and not listed at the request of the Commonwealth, Appellant fails

- 15 -

to explain why the Commonwealth should have again requested a date when trial was already scheduled.

The record further supports the trial court's conclusion that the Commonwealth was not able to request Appellant's case be moved to another judge in order to expedite trial. *See* N.T., 9/16/22, at 31; *see also* ***Commonwealth v. Anderson***, 959 A.2d 1248, 1252 (Pa. Super. 2008) (holding the Commonwealth acted with due diligence where "there was no real opportunity for the Commonwealth to seek a different courtroom."); ***Faison***, 297 A.3d at 824. As the trial court did not err in excluding either of the above-discussed periods of delay, and because Appellant's trial occurred within the adjusted Rule 600 run date, Appellant's first issue merits no relief.

In his second issue, Appellant claims the trial court erred when it failed to consider his state and federal constitutional speedy trial claims and denied him the opportunity to present evidence of prejudice.[8] Appellant's Brief at 36. Appellant alleges Ms. Jackson died during the pendency of Appellant's case,[9] and that she would have offered exculpatory testimony at trial. *Id.* at 41. Appellant argues the trial court erred when it refused to permit Appellant to

---

[8] In its brief, the Commonwealth indicated it "does not oppose a limited remand to develop the record regarding prejudice[,]" but does not concede Appellant is entitled relief. Commonwealth Brief at 20.

[9] At the September 16, 2022, Rule 600 hearing, Appellant and the Commonwealth stipulated "that Ms. [] Jackson has passed away." N.T., 9/16/22, at 7.

- 16 -

present testimony from his investigator concerning 1) the content of Ms. Jackson's proposed, purportedly exculpatory statement to the defense; and 2) "the inability to find the original treating physician at CHOP[,] as well as the original social worker who interviewed [A.A.] at CHOP…." *Id.* at 40. Consequently, Appellant requests this Court remand his case so that he may present the proffered testimony for the trial court's review. *Id.* at 43.

"The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution guarantee a criminal defendant the right to a speedy trial." *Commonwealth v. DeBlase*, 665 A.2d 427, 432 (Pa. 1995) (footnote omitted).

> "In evaluating speedy trial issues, our standard of review is whether the trial court abused its discretion, and our scope of review is limited to the trial court's findings and the evidence on the record, viewed in the light most favorable to the prevailing party." *Commonwealth v. Miskovitch*, 64 A.3d 672, 677 (Pa. Super. 2013) (citation and quotation marks omitted). Speedy trial analysis requires a two-step inquiry: "we first consider whether the delay violated Pa.R.Crim.P. 600, and if not, we may proceed to the four-part constitutional analysis set forth in *Barker* [*v. Wingo*, 407 U.S. 514 (1972)]." *Commonwealth v. Colon*, 87 A.3d 352, 357 (Pa. Super. 2014).

*Martz*, 232 A.3d at 812 (Pa. Super. 2020). *Barker*'s four-part constitutional analysis requires consideration of 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his right; and 4) prejudice to the defendant. *See Commonwealth v. Bradford*, 46 A.3d 693, 700-01 (Pa. 2012) (discussing *Barker*). "A finding in the defendant's favor of any one of the four factors, standing alone, does not constitute a speedy trial violation."

*DeBlase*, 665 A.2d at 432 (citation omitted). "[E]ach of the four factors are related and each must be weighed carefully in the court's evaluation of a criminal defendant's claim that his speedy trial rights were violated." *Id.* (citation omitted).

> In *Commonwealth v. Hamilton*, [] 297 A.2d 127, 130-33 ([Pa. ]1972), the Pennsylvania Supreme Court deemed the *Barker* balancing test inadequate to ensure a defendant's right to a speedy trial under the Pennsylvania Constitution. The Court has also suggested that "the prompt trial rule [*i.e.*, Rule 600] ... represents the sole means of securing a defendant's state constitutional right to a speedy trial." *Commonwealth v. Meadius*, [] 870 A.2d 802, 803 n.1 ([Pa. ]2005) (citing *Commonwealth v. Whitaker*, [] 359 A.2d 174, 176 ([Pa. ]1976). The Court has continued to apply the balancing test in cases where an appellant presents independent claims premised on both the procedural rule and the constitutional guarantees. [] *DeBlase*, [] 665 A.2d [at] 431 [].

*Martz*, 232 A.3d at 812.

In its Rule 1925 opinion, the trial court acknowledged that it "erroneously asserted that the constitutional speedy trial analysis was subsumed in Rule 600." Trial Court Opinion, 7/6/23, at 8 (citation omitted). Nevertheless, the trial court concluded that Appellant's constitutional speedy trial claim would not have entitled him relief:

> [T]here was no delay in violation of Rule 600(a)[;] accordingly, we turn to the *Barker* analysis to determine whether there was a delay of constitutional dimension. Here, Appellant fails the *Barker* analysis.
>
> In actual time, without regard to Rule 600, the time from Appellant's arrest to his trial in September of 2022 was 1,717 days (NT 9/16/22, 74), or 4.7 years. A delay of this length, in isolation, is presumptively prejudicial, triggering examination of the other

*Barker* factors. [*Commonwealth v. *]*Africa*, [569 A.2d 920, 923 (Pa. 1990)].

Regarding the reason for the delay, the Supreme Court explained in *Barker*:

A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason[,] such as negligence or overcrowded courts[,] should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.

[*Barker*,] 407 U.S. at 531 (footnote omitted). As discussed in the Rule 600 section, *supra*, **the reasons for the delay did not warrant a heavy weighting against the Commonwealth**.

As to [Appellant's] assertion of violation of his right to a speedy trial, Appellant states in his September 8, 2022, Motion to Dismiss that he "filed a motion under [R]ule 600([B]) on September 24, 2019, effectively asserting his right to a speedy trial to the court." Motion to Dismiss, p. 10. The court is unable to identify such a filing on the docket. Accordingly, **there is no evidence that Appellant asserted his right until the eve of trial, when he filed his Motion to Dismiss. Further, even if Appellant had so asserted, in light of the Covid[-19] crisis six months later, we would not deem the timing of the assertion particularly weighty**.

Appellant asserts that he experienced actual prejudice as a result of his pre-trial delay in the form of the death of his mother, [Ms.] Jackson, "a possible defense witness." Motion to Dismiss, p. 10. Appellant fails to identify when Ms. Jackson passed away, or what evidence she could have offered, the lack of which constituted the alleged prejudice. Without these two pieces of information in the Motion, the court had no basis from which to conclude the delay worked prejudice of a constitutional dimension. Admittedly, counsel did assert that he had an investigator who had interviewed Ms. Jackson, but [counsel] **did not make an offer of proof as to her testimony or when she had passed away either in the written motion or in court**. NT 9/16/22, 7, 83, 85.

As further ground of prejudice, Appellant asserted his inability to obtain service on the social worker and physician who examined [A.A.] at CHOP. **Neither of these persons are mentioned in Appellant's Motion to Dismiss**. Moreover, there is no basis for finding prejudice from their absence. The evidence was that [A.A.] had no discernable trauma. This was uncontested by the Commonwealth. Indeed, the Commonwealth presented expert testimony to explain why the absence of trauma did not necessarily prove that the alleged acts had not occurred. Accordingly, **the absence of these witnesses is in no way prejudicial, since all they would have done is reiterate that which was conceded – that there were no demonstrable physical injuries**. …. **To the extent that the purpose of these witnesses was to testify that the sexual assault … was vaginal and not anal, the defense elicited evidence … indicating a vaginal assault as the basis for the CHOP physician's exam of A.A. ….** NT 9/21/22, 84-88, 91.

Although the court's reason for not entertaining the motion to dismiss for lack of a speedy trial on constitutional grounds was erroneous, the motion would have been without merit, for the reasons stated above.

*Id.* at 8-10. faced

Upon review, the trial court's analysis is supported by the record, and free of legal error. Although the substantial period of pretrial delay triggered further inquiry into the ***Barker*** analysis,[10] the record supports the trial court's finding that the Commonwealth was not at fault for the delay. ***See Africa***, 569 A.2d at 923; N.T., 9/16/22, at 28, 31, 60. Further, Appellant did not

---

[10] We note the Pennsylvania Supreme Court's declaration of a general statewide judicial emergency on March 16, 2020, evidences the exceptional circumstances the Covid-19 pandemic presented to trial courts.

exercise his speedy trial rights until the eve of trial, more than 1,700 days after the institution of charges. **See Martz**, 232 A.3d at 812.

Concerning the prejudice prong, in addition to the trial court's cogent analysis, we observe Appellant referred to the deceased Ms. Jackson as a **possible** defense witness both in his motion to dismiss and during the Rule 600 hearing. **See** Motion to Dismiss, 9/8/22, at 10 ("[Ms.] Jackson, a **possible** defense witness, has passed away." (emphasis added)); N.T., 9/16/22, at 6-7 ("[Ms. Jackson], who would have been a witness in this case or who **may have been** a witness in this case, since the outset of this[,] has passed away." (emphasis added)).  Accordingly, we agree with the trial court that, on balance, the **Barker** factors do not support dismissal of Appellant's charges.  **See Commonwealth v. McCord**, 644 A.2d 1206, 1212 (Pa. Super. 1994) (concluding appellant was not entitled relief pursuant to **Barker** where there was 1) a "lack of any evidence that the delay was deliberately caused by the Commonwealth," 2) there was "minimal prejudice to the interests protected by the right to a speedy trial," and 3) appellant did not "timely assert his right to a speedy trial.").

In his final issue, Appellant argues the trial court deprived him "of his right to a fair and impartial jury by refusing to ask prospective jurors on *voir dire* if they believe a child could lie about being sexually abused…." Appellant's Brief at 44.  Appellant alleges the trial court's decision precluded him from uncovering whether prospective jurors "could fairly evaluate [A.A.'s]

testimony and base their verdict on the evidence, rather than on a preconceived, fixed belief that children could not fabricate allegations of sexual abuse." *Id.* Appellant maintains the proposed *voir dire* question was especially relevant, in that "[t]he Comm[]onwealth's case hinged on the believability of the complainant[,] her prior inconsistent statements, and lack of medical corroboration." *Id.*

The Sixth and Fourteenth Amendments of the United States Constitution guarantee a criminal defendant the right to a fair and impartial jury. *See Commonwealth v. Davis*, 273 A.3d 1228, 1239 (Pa. Super. 2022). "Thus, the jury selection process is crucial to the preservation of a criminal defendant's constitutional right to an impartial jury." *Id.* (citation omitted).

> *Voir dire* plays a critical function in assuring the criminal defendant that his right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.
>
> While this Court has explained that the scope of *voir dire* is within the sound discretion of the trial court, the United States Supreme Court has stated that the exercise of the trial court's discretion, … [is] subject to the essential demands of fairness.

*Id.* (quoting *Commonwealth v. Le*, 208 A.3d 960, 972 (Pa. 2019)); *see also Commonwealth v. Delmonico*, 251 A.3d 829, 839 (Pa. Super. 2021) ("[W]e employ a standard of review which affords great deference to the trial judge[.]" (citation omitted)).

"*Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies." *Commonwealth v. Manley*, 985

A.2d 256, 264 (Pa. Super. 2009) (citation omitted). *Voir dire* is also not "to be used to attempt to ascertain a prospective juror's present impressions or attitudes." **Commonwealth v. Ritter**, 615 A.2d 442, 447 (Pa. Super. 1992) (citation omitted). "Additionally, a court will not be found to abuse its discretion during *voir dire* examination by refusing to permit questions whose subject matter falls within the province of the court to address in its instructions to the jury." **Commonwealth v. Walker**, 305 A.3d 12, 16-17 (Pa. Super. 2023), **appeal granted**, 316 A.3d 622 (Pa. 2024).

Appellant argues that

[w]hen important testimony is anticipated from certain categories of witnesses, whose official or semi-official status is such that a juror might reasonably be more, or less, inclined to credit their testimony, a query as to whether a juror would have such an inclination is not only appropriate[,] but should be given if requested.

Appellant's Brief at 48 (citation omitted).

In response, the Commonwealth argues:

Appellant's proposed question—whether the jurors would "be more likely to believe the testimony of a child who says she was sexually assaulted because [they] believe no child would li[]e about being a victim of such a crime"—was designed to gauge how prospective jurors would respond to [A]ppellant's trial strategy[,] which claimed [A.A.] fabricated the abuse. (N.T.[,] 9/19/2022[,] at 10). This is not permitted. **See Commonwealth v. Knight**, 241 A.3d 620, 640 (Pa. 2020) (holding that the trial court did not abuse its discretion in preventing defendant from asking prospective jurors a question that would "gauge the efficacy of potential" legal strategies).

Commonwealth Brief at 24.

In support of his argument, Appellant primarily relies on two cases: **Commonwealth v. Futch**, 366 A.2d 246 (Pa. 1976), and **Capoferri v. Children's Hosp. of Philadelphia**, 893 A.2d 133 (Pa. Super. 2006) (*en banc*).

In **Futch**, the trial court precluded appellant from asking prospective jurors questions concerning the credibility of prison guards and prison inmates. **See Futch**, 366 A.2d at 248. Concluding the trial court erred, the **Futch** Court examined the record and determined that no *voir dire* questions "focuse[d] upon … the predilection of a prospective juror to credit the testimony of a prison guard simply because of the guard's official status." **Id.** at 250. The Court likewise ruled

> that there is no significant distinction between law enforcement officers as court witnesses on the one hand and prison inmates on the other. The latter classification arouses feelings that are just as capable of interfering with a jury's capacity to render a fair and impartial verdict as does the former.

**Id.** "Since the *voir dire* examination included no questions that even arguably explored this area of potential bias," the Court concluded the trial court erred by denying appellant's proposed *voir dire* questions. **Id.**

In **Capoferri**, a medical malpractice action, this Court, *en banc*, considered whether "counsel for both sides should have been permitted to question the prospective jurors" concerning their attitudes toward tort reform and medical malpractice. **Capoferri**, 893 A.2d at 142. This Court concluded:

> [W]ith the amount of publicity occurring at the time this case was ready for trial, the parties should have been allowed to question

- 24 -

prospective jurors about their attitudes regarding medical malpractice and tort reform in order to determine whether each individual juror could serve in a fair and impartial manner. Common sense dictates that the type of media coverage that accompanied the debate over tort reform created a climate from which the average person could conclude that he or she would be economically impacted and/or be deprived of accessible health care services. Because there was no question that there was pervasive media coverage on the issue of medical malpractice prior to trial in the instant case, we conclude that counsel for both sides should have been permitted to question the prospective jurors regarding the subject and attempt to glean whether there was any impact on any individual juror's ability to decide the case fairly and impartially.

*Id.* This Court cautioned, however, that it did "not necessarily endorse th[e] questions proffered by [the p]laintiffs." *Id.* at 143. Instead, the trial court should have "asked the prospective jurors appropriate preliminary questions … designed to detect, initially, whether any of the prospective jurors had been exposed to tort reform and medical negligence propaganda." *Id.* (citation omitted). As the trial court failed to follow this course, reversal was warranted. *Id.*

Both cases are readily distinguishable. *Futch* involved questioning prospective jurors concerning bias for or against law enforcement and prison inmates, while Appellant's proposed (argumentative) question sought to determine whether a category of victim was capable of lying. *Capoferri* involved questioning prospective jurors concerning a social issue garnering significant media coverage in advance of trial, and bears little resemblance to the instant case.

In its Rule 1925 opinion, the trial court explained its rationale for refusing to ask Appellant's proposed question:

[T]he [c]ourt conducted individual *voir dire* of the [prospective] jurors, addressing their responses to the juror questionnaire and engaging in follow-up questioning. Further, … Appellant sought no follow-up or additional questions as to specific jurors in the areas addressed by the rejected questions. Here, counsel for Appellant did seek other juror[-]specific follow-up questions, which the court asked. N.T., 9/19/22, at 34, 49.

Further, the jury [pool] was twice specifically informed that the purpose of the questioning was [] "to try and help determine whether you have any preconceptions or biases that might interfere with your impartial consideration of the evidence." **Id.** at 18. After being told the nature of the allegation, the prospective jurors where then asked:

Is there anything about the nature of these charges o[r] these allegations that would prevent anyone here from serving as a fair and impartial juror? If so, please raise your hand now.

**Id.** at 20-21. No prospective juror responded.

Trial Court Opinion, 7/6/23, at 11 (citations modified). The trial court further asked, during individual *voir dire*: "Is there anything that may come to mind that has not been asked that could interfere with your ability to serve fairly and impartially here?" **Id.** at 12; **see also** N.T., 9/19/22, *passim*. Based upon these questions, the trial court concluded that it had sufficiently "covered all [] areas of potential bias[.]" **Id.**

Upon review, the trial court's factual findings are supported by the record, and we agree with the legal analyses of the trial court and the Commonwealth. The cases relied upon by Appellant are plainly factually

distinguishable. Moreover, the trial court asked the prospective jurors appropriate preliminary questions designed to expose bias. **See Capoferri**, 893 A.2d at 143. Significantly, the trial court advised the prospective jurors that Appellant faced charges of, *inter alia*, rape of a **child**, and inquired whether the nature of the charges would prevent anyone from "serving as a fair and impartial juror[.]" N.T., 9/19/22, at 20-21. Thirteen jurors responded affirmatively, and, following individual questioning, the trial court excused six jurors on its own initiative. **See id.** at 21, 101, 103, 104, 145, 181, 195.

Further, we find persuasive our unpublished decision in **Commonwealth v. Smith**, 301 A.3d 928 (Pa. Super. 2023) (unpublished memorandum), **appeal granted**, 316 A.2d 620 (Pa. 2024).[11] In **Smith**, we examined whether the trial court erred in refusing to question prospective jurors on the identical question of "whether they believed a child could lie about being sexually abused[.]" **Id.** (unpublished memorandum at 4). Rejecting Smith's claim, we concluded:

> The question wholly involved the victims' credibility, was essentially argumentative, and impermissibly sought to gauge jurors' receptiveness to possible defense strategies. Moreover, the court's other questions and statements to potential jurors adequately addressed concerns about prospective jurors' ability to be impartial. … Smith offers no authority mandating that courts ask prospective jurors whether they believe a victim of a particular category of crime could lie, and we are aware of none. Instead, he cites cases upholding challenges to the denial of *voir dire*

_____

[11] Non-precedential decisions filed after May 1, 2019, may be cited for their persuasive value. **See** Pa.R.A.P. 126(b)(1)-(2).

questions relating to potentially controversial social issues, such as racial and law enforcement prejudice, tort reform, and sexual orientation, that could affect jurors' overall ability to be impartial. Accordingly, the court did not abuse its discretion in excluding Smith's question from *voir dire*.

*Id.* (unpublished memorandum at 6-7) (citations omitted).[12]

Appellant advances the same arguments as those offered to this Court in **Smith**, *supra*. As we agree with the cogent analysis set forth in **Smith**, Appellant's final issue does not entitle him relief.

Petition for remand denied. Judgment of sentence affirmed.

P. J. Lazarus joins the memorandum.

Judge Nichols concurs in the result.

---

[12] We note that on April 9, 2024, our Supreme Court granted *allocatur* to review, *inter alia*, the following issue:

In a sex abuse case where the uncorroborated testimony of two child complainants was at issue, did the Superior Court err by holding [p]etitioner had no right to ask prospective jurors if they held a fixed belief that children would not lie about being sexually abused, contrary to this Court's decisions holding that an inquiry into prospective jurors' potential bias as to the trustworthiness of certain categories of witnesses is necessary on *voir dire*?

**Commonwealth v. Smith**, 316 A.3d 620 (Pa. 2024) (*per curiam*) (numbering omitted).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date:   9/05/2024